UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TRAVIS KILLIAN, *individually and as natural parent and legal guardian of his minor children (L.K.) and (Q.K.)*,

Plaintiff,

v.

FAIRPORT CENTRAL SCHOOL DISTRICT, ROBERT CLARK, MADISON POWER, and ANDREA SAITTA,

Defendants.

**DECISION AND ORDER**

6:25-CV-06582 EAW

## INTRODUCTION

*Pro se* plaintiff Travis Killian ("Plaintiff"), acting individually and on behalf of his minor children, L.K. and Q.K., commenced an action against defendants Fairport Central School District (the "District" or "FCSD") and its personnel (collectively "Defendants") on October 16, 2025, asserting causes of action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1986, the First and Fourteenth Amendments, and state law.

Pending before the Court is Defendants' motion to dismiss (Dkt. 15), Plaintiff's motion for leave to file supplemental authority (Dkt. 20), and Plaintiff's motion for leave to file a sur-reply (Dkt. 27). For the reasons set forth below, Plaintiff's motions are granted, and Defendants' motion is granted in part and denied in part.

# BACKGROUND

## I. Factual Background

The instant facts are taken from Plaintiff's complaint. (Dkt. 1). As required at this stage of the proceedings, Plaintiff's well-pleaded factual allegations are taken as true.

Plaintiff is the father of L.K. and Q.K. and shares joint legal custody with the children's mother ("the mother")[1] pursuant to a custody agreement entered in 2019. (*Id.* at ¶¶ 10, 17). Plaintiff lives in California, and the mother has residential custody under the custody agreement. (*Id.*). L.K. and Q.K. are enrolled in FCSD schools.

On December 29, 2020, Plaintiff contacted Child Protective Services ("CPS") regarding suspected abuse in the mother's household, but "no intervention[]" occurred. (*Id.* at ¶ 19). On May 16, 2023, L.K. texted Plaintiff reporting abuse in the mother's home and desiring to move to California. (*Id.* at ¶ 20). On June 13, 2023, Plaintiff retained an attorney to obtain primary residency of L.K. and Q.K. in California. (*Id.* at ¶ 21). On June 25, 2023, L.K. emailed Plaintiff a list of 39 points detailing abuse in the mother's household, including threats against speaking with CPS. (*Id.* at ¶ 22).

During the 2022-2023 school year, L.K. reported the alleged abuse to defendant Andrea Saitta ("Saitta"), a FCSD teacher. (*Id.* at ¶¶ 14, 24). L.K. confided in Saitta that there was locked food in the mother's home, that L.K. excessively cried at home, and that L.K. wanted to move to California to live with Plaintiff. (*Id.* at ¶ 24). Saitta provided L.K. with food but did not report the allegations. (*Id.*). On July 13, 2023, Plaintiff emailed

---

[1] Plaintiff does not provide the mother's name in his complaint.

Saitta inquiring whether L.K. had informed her about the abuse, and Saitta confirmed in an email sent July 17, 2023, that L.K. had made the disclosures. (*Id.* at ¶¶ 23, 25).

On August 7, 2023 and August 12, 2023, L.K. texted Plaintiff that she was being forced to attend family therapy to discourage her from moving. (*Id.* at ¶¶ 26-27). On September 6, 2023, Plaintiff informed L.K.'s court-appointed attorney of the abuse. (*Id.* at ¶ 28). September 2023 was the last time that L.K. and Plaintiff had a "healthy and endearing open communication relationship[.]" (*Id.* at ¶ 29). That month, Plaintiff and L.K. spoke on the phone for the last time and on September 16, 2023, L.K. emailed Plaintiff. (*Id.*). Later that day, L.K. had her first therapy appointment "scheduled by her mother, to talk her out of coming to [California]. . . ." (*Id.*).

On November 14, 2023, the mother emailed District staff requesting denial of Plaintiff's access to L.K., claiming that L.K. did not want to see him, and attaching custody documents, which "contribut[ed] to parental alienation." (*Id.* at ¶¶ 30-31). The mother again emailed custody documents to the District on November 25, 2024. (*Id.* at ¶ 32).

On December 2, 2024, and December 3, 2024, Plaintiff had an email and phone exchange with Fairport High School ("FHS") Assistant Principal Madison Power ("Power") in which Plaintiff asserted his constitutional right to access to his children and his entitlement to pick them up under the joint legal custody agreement. (*Id.* at ¶ 33). Plaintiff warned Power that "[a]ny disruption caused by the school or an overreaction to [his] request to pick up [L.Q.] today will lead to a civil rights lawsuit under 42 U.S.C. § 1983 against the school, the school district, and individuals involved." (*Id.* at ¶¶ 33-34). Power's response "showed contradictions (e.g. allowed Q.K. but not L.K.), lack of training

in interpreting legal documents (rationale made no sense, ignoring joint custody), and indicated involvement of children's court-appointed attorney." (*Id.* at ¶ 33).

On December 3, 2024, Plaintiff went to FHS and "attempted a wellness check and pickup of L.K.," who was 15 years old at the time. (*Id.* at ¶ 34). Power informed Plaintiff via email that he could not take L.K. out of school because maternal permission was required, and FHS Principal Robert Clark ("Clark") physically denied Plaintiff entry into the school. (*Id.*). Plaintiff tried to film his interaction with Clark, but Clark "explicitly stated Plaintiff could not film him." (*Id.*). Clark "physically obstructed Plaintiff from entering the school office or summoning L.K. from her classroom, refused to allow Plaintiff to record the exchange despite it occurring in a public area during official business, and prevented Plaintiff from speaking freely about his custodial rights. . . ." (*Id.*).

Although the District "refused police involvement[,]" the Monroe Couty Sheriff's Office became involved, and their report stated that "the mother admitted Plaintiff's pickup rights, but (L.K.) refused" to go with Plaintiff. (*Id.*). Clark and Power's denial of Plaintiff's access to L.K. "caused years of non-contact with L.K., as the school was the only place Plaintiff could pick up the children due to the mother deliberately prohibiting lawful contact" between Plaintiff and the children. (*Id.*). The District did not discipline Clark or Power for their conduct. (*Id.* at ¶ 33).

During a hearing in family court, the mother testified that Plaintiff had never caused harm to the children and that he had only been trying to maintain contact with them. (*Id.* at ¶ 35). On December 13, 2024, the family court issued a custody order "conflicting with [the] joint custody terms." (*Id.* at ¶ 36).

Plaintiff alleges that as a result of Defendants' actions, he has suffered from emotional distress, the loss of a relationship with L.K., financial harm, and the violation of his fundamental right to a parent-child relationship. (*Id.* at ¶ 84). He also alleges harm to the children. (*Id.*). Plaintiff claims compensatory damages in the amount of $2,000,000 from the District, $250,000 from Clark, and $250,000 from Power. (*Id.* at ¶ 86). Plaintiff also seeks punitive damages from Clark and Power. (*Id.*).

## II. Procedural Background

On October 16, 2025, Plaintiff filed a complaint on behalf of himself, L.K. and Q.K. against the District, Clark, Power, and Saitta. (Dkt. 1). Plaintiff asserted causes of action under 42 U.S.C. § 1983 for violations of due process under the Fourteenth Amendment, violations of the Equal Protection Clause, and violations of the First Amendment, and a cause of action under 42 U.S.C. § 1986 for neglect to prevent a conspiracy to deprive Plaintiff of equal protection. Plaintiff also asserted state-law claims, including a claim against the District that it failed to follow District policy, a claim for failure to report suspected child maltreatment against Saitta and the District, intentional infliction of emotional distress against Clark, Power, and the District, and negligence against Clark, Power, and the District.

Defendants filed a motion to dismiss on January 5, 2026. (Dkt. 15). Plaintiff filed papers in opposition (Dkt. 23), and Defendants replied (Dkt. 25). Plaintiff subsequently

filed a motion for leave to file notice of supplemental authority (Dkt. 20)[2] and a motion for leave to file a sur-reply (Dkt. 27).

## DISCUSSION

### I. Motion for Leave to File Notice of Supplemental Authority; Motion to File Sur-Reply

In his motion for leave to file notice of supplemental authority, Plaintiff identifies a case from the Western District of Texas that, according to him, is directly relevant to Plaintiff's claims under 42 U.S.C. § 1983. (Dkt. 20). Plaintiff also seeks to file a sur-reply in order to respond to "new arguments, material mischaracterizations of the record, and [] unsubstantiated attacks[s]" within Defendants' reply. (Dkt. 27). Defendants have not filed any opposition to these motions.

"The general principle is that supplemental filings require leave of the court." *Neary v. Weichert*, 489 F. Supp. 3d 55, 62 (E.D.N.Y. 2020). Ultimately, "whether to permit the filing of a sur-reply is entirely within the Court's discretion." *Marseet v. Rochester Inst. of Tech.*, No. 20-CV-7096FPG, 2022 WL 2718509, at *1 (W.D.N.Y. July 13, 2022); *see Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

---

[2] Although Plaintiff's motion for leave to file notice of supplemental authority was received by the Court prior to its receipt of Plaintiff's response to the motion to dismiss, the date and postmark of Plaintiff's opposition papers (January 29, 2026) reflect that his response was mailed before the motion for leave to file notice of supplemental authority was submitted.

Here, although Plaintiff's motions were not in strict compliance with Local Rule of Civil Procedure 7, Plaintiff sought the Court's permission before filing these papers and supplied purportedly valid reasons for why the information was not included in his initial response to the motion to dismiss, such as that the decision he relies upon was released only days before his opposition papers were due, and that Defendants raised new arguments and made misstatements in their reply papers. Particularly in light of Plaintiff's *pro se* status, *see Mcgillvary v. Rolling Stone, LLC*, No. 25-1599, 2026 WL 946337, at *1 n.1 (2d Cir. Apr. 8, 2026); *Bradshaw v. Piccolo*, 772 F. Supp. 3d 331, 341 (W.D.N.Y. 2025), and the lack of objection from Defendants, the motions are granted. The supplemental authority (Dkt. 20) will be considered as appropriate, and the Clerk of Court is directed to file the sur-reply, attached as Exhibit A to Plaintiff's motion (*see* Dkt. 27 at 4-26) on the docket.

## II. Motion to Dismiss

### A. Rule 12(b)(6) Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

In addition, "[i]t is well settled that *pro se* litigants generally are entitled to a liberal construction of their pleadings, which should be read 'to raise the strongest arguments that they suggest.'" *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (citation omitted). While the Court is "obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must satisfy the plausibility standard set forth in *Iqbal* and *Twombly*, *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("Even after *Twombly*, though, we remain obligated to construe a *pro se* complaint liberally.")

Similarly, a court should generally grant a *pro se* plaintiff leave to amend "at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation

omitted). Nonetheless, leave to amend pleadings is properly denied where amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.").

**B. Claims On Behalf of Minor Children**

Defendants argue that to the extent Plaintiff is bringing claims on behalf of his minor children, those claims must be dismissed because a parent proceeding *pro se* is barred from filing suit for their minor children. (Dkt. 15-1 at 11; Dkt. 25 at 6). Plaintiff's response indicates that he is seeking to bring the causes of action on behalf of L.K. and Q.K. (Dkt. 23 at 21-22).

There is a "well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action *pro se* in federal court on behalf of his or her child." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005). "Furthermore, the choice to appear *pro se* is not a true choice for minors who under state law, cannot determine their own legal actions." *McFarlane v. Roberta*, 891 F. Supp. 2d 275, 283 (D. Conn. 2012) (citing *Cheung v. Youth Orchestra Found., Inc.*, 906 F.2d 59, 61 (2d Cir. 1990)). It is undisputed that Plaintiff is proceeding *pro se*, and his response papers state that he is not seeking appointment of counsel. (Dkt. 23 at 22). Therefore, even though Plaintiff is the father of L.K. and Q.K., he is unable to bring claims on their behalf absent legal representation. Accordingly, the Court dismisses L.K. and Q.K. as parties without leave to

amend because Plaintiff is unable to assert claims on behalf of his minor children given his *pro se* status.

**C. Section 1983 Claims**

Plaintiff asserts several claims pursuant to 42 U.S.C. § 1983. Against all defendants, Plaintiff alleges a violation of procedural and substantive due process under the Fourteenth Amendment for violating Plaintiff's parental rights and interfering with familial association (Count One and Count Seven against Clark, Power and the District only). Against Clark, Power, and the District, Plaintiff also alleges discriminatory treatment based on his parental custodial status under the Equal Protection Clause (Count Two), retaliation under the First and Fourteenth Amendments (Count Six), and free speech violations under the First Amendment (Count Ten).

"Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).

**i. Individual Defendants' Liability**

Defendants contend that to the extent Plaintiff has sued Clark, Power, and Saitta in their official capacities, those claims should be dismissed. (Dkt. 15-1 at 25). Inasmuch as

Plaintiff's complaint does name Clark, Power, and Saitta in their official capacities (*see* Dkt. 1 at ¶¶ 12-14), the Court agrees that those claims should be dismissed and the suit may only proceed against Clark, Power, and Saitta in their individual capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (quotation modified)); *Alger v. Cnty. of Albany*, 489 F. Supp. 2d 155, 165 (N.D.N.Y. 2006) (dismissing a "claim against an individual in her official capacity [as] nothing more than a claim against the municipality itself"); *Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003) ("[A] suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the entity of which the officer is an agent.").

Defendants further contend that the § 1983 claims asserted against Clark, Power, and Saitta in their individual capacities must also be dismissed because Plaintiff has failed to allege that any of them violated his constitutional rights. (Dkt. 15-1 at 26; Dkt. 25 at 12). According to Defendants, Plaintiff "engages in group pleading . . . and fails to identify what actions, if any, these individuals took that deprived him of his constitutional rights." (Dkt. 15-1 at 26).

The only claim that the Court believes suffers from deficient allegations of personal involvement is the Fourteenth Amendment claim against Saitta (Count One). Because that cause of action is tied to the events that occurred on December 3, 2023, and the complaint is devoid of allegations of Saitta's involvement that day, the Court agrees that Count One must be dismissed against Saitta. But even a cursory review of the complaint reflects that

Plaintiff has otherwise pleaded the personal involvement of each individual defendant for the claims against them. The crux of Plaintiff's allegations are that Clark and Power restricted his access to the school, refused to release L.K. to him, and took that action at least in part because he informed Power that he would file a civil rights lawsuit against the District if officials did not allow him to assert his rights under the joint custody agreement. Those allegations are sufficient to plausibly establish that Clark and Power personally contributed to the alleged deprivation of Plaintiff's constitutional rights.

Accordingly, the official capacity claims against Clark, Power, and Saitta are dismissed, as is the only § 1983 claim as asserted against Saitta (Count One alleging violation of parental rights claim under the Fourteenth Amendment). Because it is at least feasible that the failure to plead personal involvement by Saitta could be cured through an amended pleading, Plaintiff is granted leave to replead Count One as to Saitta (with respect to the procedural due process claim only, as the substantive due process claim cannot be cured through better pleading, for the reasons discussed below). The motion to dismiss based on lack of personal involvement is otherwise denied.

**ii. Municipal Liability**

Defendants move to dismiss Plaintiff's § 1983 claims against the District pursuant to *Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 690 (1978). Defendants contend that Plaintiff has failed to identify any custom, policy, or final policymaker responsible for the alleged actions that violated Plaintiffs' constitutional rights. (Dkt. 15-1 at 24-25; Dkt. 25 at 11-12). Plaintiff responds that Clark constitutes a final policymaker

who ratified unconstitutional conduct, and that the District's failure to train its employees on joint custody contributed to the unconstitutional conduct. (Dkt. 23 at 40-43).

"[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). School districts "are considered municipal entities that can be sued under § 1983." *Doe v. E. Irondequoit Cent. Sch. Dist.*, No. 16-CV-6594 (CJS), 2018 WL 2100605, at *16 (W.D.N.Y. May 7, 2018) (citations omitted). "[T]o hold a [school district] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).

Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. To survive a motion to dismiss, the plaintiff "cannot merely allege the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (quotation modified). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent

> and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (internal citations omitted); *Hurdle v. Bd. of Educ. of City of N.Y.*, 113 F. App'x 423, 424-25 (2d Cir. 2004) ("A school district's liability under *Monell* may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'" (citations omitted)); *see also Dole v. Huntington Union Free Sch. Dist.*, 699 F. App'x 85, 87 (2d Cir. 2017) ("A school district is a municipal entity, and as such, cannot be held liable pursuant to § 1983 solely because of the discriminatory actions of one of its employees" but only "if its 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'").

Importantly, "[a] municipality may . . . be liable for even a single unconstitutional act of an official who has final policy-making authority." *Taylor v. City of N.Y. (Dep't of Sanitation),* No. 17 CV 1424-LTS-SDA, 2019 WL 3936980, at *5 (S.D.N.Y. Aug. 20, 2019). "If an official's decision was, at the time it was made, for practical or legal reasons the municipality's final decision, then they are a final policymaker." *Id.* (alterations and quotation omitted); *see also Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) ("A single unlawful discharge, if ordered by a person 'whose edicts or acts may fairly be said to represent official policy,' *Monell*, 436 U.S. at 694, may support an action against

the municipal corporation. . . . Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy."); *Barzilay v. City of N.Y.*, 610 F. Supp. 3d 544, 618 (S.D.N.Y. 2022) ("Because '[a]n official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions,' to determine whether someone has the requisite policy-making authority, a court must consider 'proof of the official's scope of employment and his role within the municipal or corporate organization.' . . . Thus, evidence that an individual 'held a top level position with [an organization] and had authority to order' personnel decisions, along with evidence that the individual's 'authority over personnel decisions was final' . . . is sufficient to show a municipal policy." (quoting *Rookard*, 710 F.2d at 45)). At the pleading stage, a plaintiff must allege sufficient facts to support a fair inference for such a conclusion. *Taylor*, 2019 WL 3936980, at *5; *Morizio v. Town of Oyster Bay*, No. CV 14-1241 (LDW) (SIL), 2015 WL 13721649, at *7 (E.D.N.Y. Apr. 24, 2015) ("Notably, [a]t the pleadings stage, it is sufficient for the complaint to allege facts suggesting that Defendants may be determined to have final policymaking authority as a matter of law." (citation and quotation omitted)).

Plaintiff's first proffered basis for *Monell* liability is that Clark is a final policymaker such that his refusal to allow Plaintiff to enter the school, release L.K. to Plaintiff, and permit Plaintiff to film their interaction became the District's official policy on those subjects. (Dkt. 23 at 40-41). Plaintiff's theory is belied by *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86 (2d Cir. 2020), in which the Second Circuit dispelled of the notion that "a public school principal acts as a final policymaker to the extent that the ultimate harm that

befell the plaintiff was under the principal's control." *Id.* at 100. As clarified in *Friend v. Gasparino*, 61 F.4th 77 (2d Cir. 2023), the Court in *Agosto* "rejected the plaintiff's argument that the school principal was the '*de facto* final municipal policymaker on those specific matters involving' the plaintiff because '[a] municipality's going along with discretionary decisions made by its subordinates is not a delegation to them of the authority to make policy.'" *Id.* at 94. The court cautioned against erroneously "equating a final decisionmaker with a final policymaker," noting that such an approach "would effectively impose *respondeat superior* liability—making the municipality liable for the conduct of its employees—in violation of *Monell* itself" and "would risk imposing *Monell* liability for almost every action a principal takes." *Agosto*, 982 F.3d at 100, 101.

Here, Plaintiff's position suffers from that false equivalency. Plaintiff states in his opposition papers that "Clark, as Principal, was the final decision-maker for student release at [FHS][,]" that "[h]is decision to deny Plaintiff access was the District's policy for that matter[,]" and that his decision "was not reviewed by any higher authority" and therefore "[b]ecame the District's final position on the matter." (Dkt. 23 at 40). But Plaintiff does not allege that Clark was empowered with the ability to create policy, nor does he cite legal authority establishing that a principal of a public high school is instilled with that ability. Plaintiff does point to numerous District policies that allegedly are relevant to Clark's conduct (Dkt. 1 at ¶¶ 45, 53), but "[t]hat [Clark] might possess some amount of discretion under the [policies] when applying the relevant provided standards, or that [he] might fail to follow the policy to the letter, does not transform [his] actions into official municipal policies." *I.S. ex rel. Disla v. Binghamton City Sch. Dist.*, No. 3:19-CV-0513 (GTS/MJK),

2024 WL 3804110, at *31 (N.D.N.Y. Feb. 1, 2024). While Clark may have been the final decisionmaker on the questions of whether Plaintiff was permitted to enter the school, L.K. was able to leave with Plaintiff, and Plaintiff could record in the school, there are no facts from which this Court could reasonably conclude that Clark had final policymaking authority over the rules that were to guide those decisions. Indeed, New York Education Law § 1709(2) delegates to the board of education—not a school principal—the duty to "establish such rules and regulation concerning the order and discipline of the schools," and following the decision in *Agosto*, courts within the Second Circuit have routinely found that principals of public schools do not have that policymaking authority. *See, e.g., Baeringer v. Plainview-Old Bethpage Cent. Sch. Dist.*, No. 23-cv-03557 (FB) (SIL), 2024 WL 3161814, at *4-5 (E.D.N.Y. June 25, 2024) (dismissing claim against school district because principal was not a final policymaker for *Monell* purposes); *I.S. ex rel. Disla*, 2024 WL 3804110, at *31 (same); *Rivera v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, No. 19 Civ. 11624 (KPF), 2021 WL 5399437, at *6-8 (S.D.N.Y. Nov. 18, 2021) (same). For these reasons, Plaintiff has failed to plausibly allege a theory of final policymaker liability against the District.

The second way by which Plaintiff seeks to establish *Monell* liability is by alleging that the District's failure to train its employe es on joint custody contributed to the unconstitutional conduct. (Dkt. 1 at ¶¶ 61-62). Plaintiff proffers that the District's policies omit any protocol for how its staff should approach parents with joint legal custody and that the lack of instruction proximately caused the denial of Plaintiff's rights. (*Id.*).

"In order for municipal nonfeasance—e.g., the failure to train, to supervise, or to discipline—to give rise to *Monell* liability, the alleged municipal failure must 'amount[ ] to deliberate indifference to the rights of [the] person with whom the [municipal employees] come into contact.'" *DS ex rel. CS*, No. 6:19-CV-6528 EAW, 2022 WL 673119, at *13 (W.D.N.Y. Mar. 7, 2022) (citation omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted). Only in limited circumstances can a failure to train "certain employees about their legal duty to avoid violating citizens' rights . . . rise to the level of an official government policy for purposes of § 1983." *RF v. S. Country Cent. Sch. Dist.*, No. 13-cv-2710 (SJF)(AKT), 2016 WL 5349782, at *11 (E.D.N.Y. Sept. 23, 2016) (quoting *Connick*, 563 U.S. at 61).

Plaintiff contends that the case of *P.W. v. Fairport Cent. Sch. Dist.*, 927 F. Supp. 2d 76 (W.D.N.Y. 2013) put the District "on notice of potential civil rights violations" such that the District's failure to train its employees constitutes deliberate indifference. (Dkt. 23 at 41; *see* Dkt. 1 at ¶ 62(a)). The Court is not so persuaded. In that case, the plaintiff sued the District for inadequately responding to peer-on-peer bullying, alleging violations of substantive due process, Title IX, and state law. *Id.* at 78. The Court does not see how a constitutional violation premised on alleged employee failure to appropriately respond to student bullying would trigger the District's duty to train its employees to handle issues related to joint custody. In any event, the court in *P.W.* dismissed the plaintiffs' § 1983 claim, finding that the complaint did not plead a plausible violation of substantive due

process. *Id.* at 86. Thus, not only was the District not placed on notice of constitutional violations regarding parental custody by *P.W.*, but the District was not placed on notice of any constitutional violations at all. Because Plaintiff has not identified any other instances that would have informed the District of deficiencies in its employees' conduct, Plaintiff has not plausibly established deliberate indifference.

Finally, to the extent that any allegations in Plaintiff's complaint suggest that the purported conduct was pursuant to a District policy (*see* Dkt. 1 at ¶ 53 (identifying "the defective Policy 7270 that omits joint legal custodial parents and led to improper labeling of Plaintiff as non-custodial . . .")), they are wholly conclusory and lack any factual detail. *Vasquez v. City of N.Y.*, No. 20-cv-4641 (ER), 2023 WL 8551715, at *5 (S.D.N.Y. Dec. 11, 2023) ("Similarly, courts dealing with *Monell* claims have 'disregarded' the use of 'conclusory' allegations that do not provide additional support that a plaintiff's experience is consistent with a larger pattern of similar conduct.").

Because Plaintiff has not established that the District can plausibly be held liable for the actions alleged in the complaint, all claims asserted against the District pursuant to § 1983 are hereby dismissed.[3] Consistent with the Court's obligation to afford a *pro se*

[3] The District additionally contends that any claims for punitive damages asserted against it pursuant to Plaintiffs' § 1983 claim must be dismissed. (Dkt. 15-1 at 32-33). Inasmuch as a school district may not be held liable for punitive damages under § 1983, *see Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 148 (2d Cir. 1983) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)), the Court agrees that punitive damages may not be recovered against the District. But this is a strawman argument because neither the complaint nor Plaintiff's response indicate that he is seeking punitive damages against the District.

plaintiff at least one opportunity to cure deficiencies in pleading, Plaintiff is afforded an opportunity to file an amended complaint to attempt to plead his § 1983 claims against the District pursuant to *Monell*.

**iii. First Amendment—Counts Six and Ten**

Plaintiff brings multiple claims under the First Amendment. The sixth cause of action alleges First Amendment retaliation, asserting that Clark and Power retaliated against Plaintiff by denying Plaintiff access to L.K. on December 3, 2024, because of his statement that he would file a civil rights lawsuit against the District if he was not permitted to see L.K. (Dkt. 1 at ¶¶ 67-69). Plaintiff's tenth cause of action alleges that Clark and Power "retaliated against Plaintiff for asserting his parental rights" and violated his rights under the First Amendment "by physically blocking entry to the school office, preventing Plaintiff from summoning (L.K.) for class, and refusing to allow video recording . . . chilling Plaintiff's protected speech." (*Id.* at ¶ 81). Defendants move to dismiss Plaintiff's claims for violations of the First Amendment, including his claims for retaliation and free speech violations. (Dkt. 15-1 at 16-21).

**a. First Amendment Retaliation**

Initially, Defendants contend that any claim under the sixth cause of action alleging a violation of Plaintiff's Fourteenth Amendment substantive due process rights must be dismissed as duplicative of his First Amendment claims. (Dkt. 15-1 at 16-17). "Where a particular [constitutional] Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing

these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *Schachtler Stone Prods. LLC v. Town of Marshall*, No. 6:21-CV-001100 (AMN/MJK), 2024 WL 4025862, at *13 (N.D.N.Y. Sept. 3, 2024) ("It is 'well established' that '[w]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.'" (quoting *Hu v. City of N.Y.*, 927 F.3d 81, 104 (2d Cir. 2019)). Because Plaintiff's claims of retaliation in his sixth cause of action are brought as violations of both the First and Fourteenth Amendments, the Court agrees with Defendants that Plaintiff's Fourteenth-Amendment claims are subsumed by his claims of First Amendment retaliation and warrant dismissal. *See Collins v. Putt*, 979 F.3d 128, 136 (2d Cir. 2020) (plaintiff's substantive due process claim subsumed by the alleged First Amendment violations); *see also Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) (same); *Brown v. Wagner*, No. 12-CV-736S, 2014 WL 234821, at *6 (W.D.N.Y. Jan. 22, 2014) ("Because the remaining claims sound in the First Amendment . . . [plaintiff's] substantive due process claim . . . must be dismissed.").

To state a First Amendment retaliation claim in the context of a private citizen, a plaintiff must plausibly allege: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

On the first element, Defendants contend that Plaintiff has failed to demonstrate that he participated in constitutionally protected speech or activity by sending an email to Power

asserting his custody rights, demanding access to L.K., and warning that he would file a civil rights lawsuit if the District deprived him of his right to access his child. (Dkt. 15-1 at 17-18). The Court disagrees. "The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994). In fact, "[t]he Supreme Court has described the right to petition government for redress of grievances as 'among the most precious of the liberties safeguarded by the Bill of Rights.'" *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (quoting *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)). And as Plaintiff cites in his complaint and opposition papers, the Supreme Court has held that "[t]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Based on the clear guidance that the commencement of a lawsuit is a constitutionally protected activity under the First Amendment, the Court is not prepared to state that as a matter of law, a statement of intent to exercise that right and petition the government for redress of an alleged constitutional violation by public school employees does not plausibly meet that standard.

Second, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001)). To the extent that Defendants contend that Plaintiff has failed to plausibly allege that he was barred from the school as a result of his email, the fact that the email was sent either on the same day or the day before he attempted to enter the school is

sufficient to plausibly establish a causal connection between the protected activity and the adverse action. *See Mateo v. Fischer*, 682 F. Supp. 2d 423, 435 (S.D.N.Y. 2010) (denying motion to dismiss where the plaintiff alleged adverse action was taken one dater after he engaged in protected activity).

Third, Defendants submit that Plaintiff has not sufficiently alleged that he was subjected to an adverse action resulting in the chilling of his speech. Contrary to that position, the Second Circuit clarified in *Dorsett* that silencing of the plaintiff's speech is a sufficient but not necessary injury to establish a plausible claim for First Amendment retaliation. 732 F.3d at 160 ("Chilled speech is not the *sine qua non* of a First Amendment claim."). Rather, "[a] plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Id.* So long as a plaintiff can plausibly demonstrate that "defendant's actions caused him some injury," including "[v]arious non-speech related harms," the injury requirement is satisfied to withstand a motion to dismiss. *Id.* (noting that a loss of a government contract, additional scrutiny at border crossings, revocation of building permits, and refusal to enforce zoning laws are all adequate cognizable harms). Here, Plaintiff alleges that as a result of his email, Clark and Power refused him access to his child despite his "documented custody rights." The purported deprivation of a parent's legal access to their child plausibly establishes an injury sufficient to establish a non-speech related harm. *See Kennedy v. Caruso*, No. 3:19-cv-260(VLB), 2021 WL 5415262, at *18 (D. Conn. Nov. 19, 2021) (identifying a parent's inability to obtain their children when the parent has a right to do so as a potential concrete harm); *see generally Doe v. City of N.Y.*,

No. 18-cv-670 (ARR) (JO), 2018 WL 3824133, at *13 (E.D.N.Y. Aug. 9, 2018) ("[T]he Second Circuit now requires private citizens raising First Amendment claims to show only a concrete harm sufficient to constitute an 'injury in fact' sufficient for standing.").

The motion to dismiss Plaintiff's First Amendment retaliation claim against Clark and Power as alleged in Counts One and Ten is therefore denied.

**b. Free Speech Violation**

Plaintiff alleges that Clark and Power engaged in a violation of his rights under the First Amendment by blocking his entry to the school and refusing to allow Plaintiff to record. Defendants maintain that in both respects, Plaintiff fails to plead an interest protected by the First Amendment. (Dkt. 15-1 at 19-21; Dkt. 25 at 10).

The Court agrees with Defendants that Plaintiff's claim for a violation premised on Clark and Power's restriction on his ability to be within the school is deficient because it does not implicate a protected right. The Second Circuit has rejected the notion that a parent has an unlimited right of access to school property and explicitly stated that "a school principal has 'the authority . . . and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property' and that they do not engage in disruptive or 'threatening conduct that disturbs the tranquility of schools.'" *Johnson v. Perry*, 859 F.3d 156, 172-73 (2d Cir. 2017) (quoting *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999)); *see Jones v. Bay Shore Free Sch. Dist.*, 666 F. App'x 92, 94 (2d Cir. 2016) ("[The parent] concedes on appeal that he has no protected right to access school property."). The extent to which the Second Circuit has recognized a right to access school property is confined to presence at events open to the public, *see Johnson*, 859 F.3d

at 175 ("[T]he school may regulate access to its gymnasium when it is being used as a limited public forum only if its restrictions are reasonable and viewpoint-neutral."); *see also Frierson v. Reinisch*, 806 F. App'x 54, 58 (2d Cir. 2020), but the allegations in the complaint do not fall within that scenario. Accordingly, Plaintiff has not plausibly established that a First Amendment violation occurred from refusing his access to the school building.[4]

Similarly, the Court concludes that Plaintiff has not plausibly asserted a protected activity by relying on the allegation that he was video recording within the school. Whether a private person has a right under the First Amendment to take a video of a school official within a public school appears to be a matter of first impression in this Circuit. The discourse regarding the public's right to take video recordings of state officials has thus far primarily centered around whether the First Amendment affords protection for recording law enforcement. *See, e.g., Charles v. City of N.Y.*, No. 12-CV-6180 (SLT) (SMG), 2017 WL 530460, at *17-19 (E.D.N.Y. Feb. 8, 2017) (plaintiff alleged she was arrested because of her video recording of police officers interacting with teens on a public street); *see e.g. Basinski v. City of N.Y.*, 192 F. Supp. 3d 360, 367-68 (S.D.N.Y. 2016) (plaintiff was recording a police officer interacting with a street vendor on a public sidewalk); *Higginbotham v. City of N.Y.*, 105 F. Supp. 3d 369, 379-80 (S.D.N.Y. 2015) (plaintiff arrested after recording violent police arrest on public street). Although the vast majority

---

[4] For the same reasons, insofar as Plaintiff alleges a violation of due process resulting from the denial of his access to the school (Dkt. 1 at ¶¶ 52-57), Defendants' motion to dismiss that claim (Dkt. 15-1 at 12) is granted.

of district courts in the Circuit—and several Courts of Appeals across the country—have determined that the First Amendment encompasses that activity, the Second Circuit has "yet to recognize[] a First Amendment right to record law enforcement activities." *Reyes v. City of N.Y.*, 141 F.4th 55, 72 n.16 (2d Cir. 2025); *see also Charles*, 2017 WL 530460, at *21-22 (noting that the First, Seventh, Ninth, and Eleventh Circuits "have either held or implied that a right to film police activity exists, at least under some circumstances"); *Irizarry v. Yehia*, 38 F.4th 1282, 1289-1292 (10th Cir. 2022) ("[W]e conclude there is a First Amendment right to film the police performing their duties in public.").

It is no surprise then that the Second Circuit has also not addressed whether the First Amendment protects the act of recording school officials in a public school. It appears that only the First Circuit has. In *Pitta v. Medeiros*, 90 F.4th 11 (1st Cir. 2024), the First Circuit analyzed whether a parent who was denied his request to video record a meeting with school district employees to discuss the individualized educational program ("IEP") of his child had stated a plausible claim for a violation of his rights under the First Amendment. In arguing that he was exercising a First Amendment right, the parent relied on cases from the First Circuit that recognized the right to video and audio record police officers discharging their official duties in public space. *Id.* at 17-20 (citing *Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020); *Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014); *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999)). The First Circuit rejected the proposition that those cases established "a First Amendment right to record exists whenever 'public officials' are operating in 'public spaces[,]'" finding that such an argument "ignore[d] limitations imposed both explicitly

and implicitly by these cases." *Id.* at 20. The court distinguished those cases on numerous grounds, including that the IEP meeting did not take place in a space open to the public, attendance at the meeting was limited to the parent and members of the student's IEP team, the topics discussed at the meeting involved personal and sensitive information, and each cited case was specific to one type of public official: police officers. *Id.* at 22.

Despite the apparent differences between *Pitta* and the facts at hand, the Court nonetheless finds that the First Circuit's reasoning relevant and it warrants the same result here for several reasons. First, public schools are characterized as non-public forums unless they have opened their facilities to public use. *See Peck v. Baldwinville Cent. Sch. Dist.*, 426 F.3d 617, 626-27 (2d Cir. 2005); *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 723-24 (2d Cir. 1994); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). As such, entering FHS during school hours when there is no allegation of an ongoing public event is not analogous to being present on a public street or sidewalk for the purpose of establishing that the video recording occurred in public. Those differences make the Court unconvinced that Clark and Power can be fairly characterized as having been performing their duties in public.

Second, even though school officials qualify as state actors with regard to being bound by the First Amendment, *see N.J. v. T.L.O.*, 469 U.S. 325, 336 (1985) ("We have held school officials subject to the commands of the First Amendment,"); *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and school officials, consistent with the fundamental constitutional safeguards, to prescribe and

control conduct in the schools."), the Court is unpersuaded by the application of such a broad definition of "public official" in this context. *See Project Veritas Action Fund*, 982 F.3d at 843 (rejecting the position that "government official" is properly defined as any "civil servant" or "public employee", comparing "a restriction on the recording of a mayor's speech in a public park" with "a restriction on the recording of a grammar school teacher interacting with her students in that same locale.").

Third, the First Amendment principles that have guided courts to the conclusion that recording police activity is a constitutionally protected action are not present here. *See, e.g., Pitta*, 90 F.4th at 22-23 ("Our cases have repeatedly framed the right to record public information as linked to the right of the public to receive this information."); *Higginbotham*, 105 F. Supp. 3d at 379 ("There is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs. Relatedly, the dissemination of information relating to alleged governmental misconduct lies at the core of the First Amendment. The videotaping of police officers in the performance of their duties in public plainly furthers these First Amendment goals." (citation modified) (internal citations omitted)). In other words, although the Court has no doubt that the information was important to Plaintiff personally, there is no identifiable public interest in Plaintiff's interaction with school officials, particularly related to his personal custody dispute.

In light of the lack of guidance from the Second Circuit regarding the extent to which it would choose to recognize a First Amendment right to record *any* public officials acting in their official capacities, the Court is especially hesitant to expand that right

beyond what any other Circuit Court of Appeals has recognized. The Court concurs with Defendants that Plaintiff has failed to plead a right protected under the First Amendment, and Plaintiff's claims for a free-speech violation are dismissed. Because the deficiencies with this claim cannot be cured through better pleading for the legal reasons discussed above, the Court declines to grant Plaintiff leave to amend.[5]

**iv. Fourteenth Amendment—Counts One, Two and Seven**

Plaintiff's first and seventh causes of action are claims under the Fourteenth Amendment for violations of procedural and substantive due process. Plaintiff alleges that his fundamental right of familial association was violated when Clark and Power refused his access to L.K., and that his access to L.K. was revoked without due process. (Dkt. 1 at ¶¶ 53, 71). Plaintiff's second cause of action asserts a violation of the Equal Protection Clause in which Plaintiff alleges that by refusing to allow Plaintiff to take L.K. out of school, Clark and Power unlawfully treated Plaintiff differently from L.K's mother. (*Id.* at ¶ 59).

**a. Procedural Due Process**

Defendants seek dismissal of the procedural due process claim on several grounds, including that Plaintiff's allegation that he was deprived of his interest in familial

[5] Even if the Court found that Plaintiff had plausibly established a violation of free speech based on Clark's directive to stop video recording, Defendants would likely be entitled to qualified immunity on this count. *See Vazquez v. Cruz*, No. 5:24-CV-164, 2026 WL 852943, at *6-7 (S.D. Tex. Mar. 26, 2026) (finding that a school superintendent would be entitled to qualified immunity on claim that he retaliated against a parent for exercising his right to record because "there is not a clearly established right to record school officials to record school officials at Board meetings free from restrictions on the manner or location of recording or recording employees on district-owned property.").

association is a matter of substantive due process, not procedure; Plaintiff has not identified a protected liberty interest; and Plaintiff has failed to allege that he was deprived of custody over L.K. (Dkt. 15-1 at 11-13; Dkt. 25 at 6).

"[P]arents have 'a constitutionally protected liberty interest in the care, custody, and management of their children.'" *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999)). "'As a general rule . . . before parents may be deprived of the care, custody, or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them.'" *Southerland v. City of N.Y.*, 680 F.3d 127, 149 (2d Cir. 2012) (quoting *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003)). Thus, inasmuch as it is readily apparent that Plaintiff has a protected liberty interest in the custody of L.K. that cannot be taken away without due process, the Court finds Defendants' first and second grounds for dismissal wholly without merit.

In addition, the Court is unpersuaded by Defendants' position that dismissal of this claim is warranted because Plaintiff "has not—nor could he—allege[] that he was deprived of custody over L.K. because of the December 3, 2024 incident." (Dkt. 15-1 at 13). To the contrary, the complaint alleges that despite the school's knowledge that Plaintiff had joint legal custody over L.K. and the corresponding right to pick L.K. up from school, the school nonetheless refused to release L.K. to him. (Dkt. 1 at ¶¶ 31-34). The Court views those allegations sufficient to plausibly establish that Clark and Power deprived Plaintiff of custody over L.K. without due process, at least temporarily. The cases cited by Defendants, *see K.D. v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 215-16 (S.D.N.Y.

2013) (dismissing procedural due process claim because the in-school interview of a minor child without parental consent did not violate the parents' liberty interest); *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 375-76 (S.D.N.Y. 2012) (noting that "a physical removal of the child—even for a short duration—might be sufficient to implicate the parents' liberty interest in the child's care, custody, and management for a procedural due process claim"), do not compel a different result. And Defendants repeatedly ignore Plaintiff's allegation that the denial of access to L.K. on December 3, 2024 "caused years of non-contact with (L.K.), as the school was the only place Plaintiff could pick up the children due to the mother deliberately prohibiting lawful contact." (Dkt. 1 at ¶ 34). At this stage in the proceeding in which the Court must take the facts in the complaint as true and afford Plaintiff every reasonable inference, Plaintiff has therefore pleaded sufficient facts to establish a plausible procedural due process violation.

**b. Substantive Due Process**

Defendants allege that Plaintiff has failed to plausibly plead a substantive due process violation because "the refusal to permit Plaintiff to remove L.K. from school against her wishes cannot possibly be deemed to be arbitrary or so egregious as to shock the conscience" because "[s]uch temporary deprivations do not result in the parents' wholesale relinquishment of their right to rear their children, so they are not constitutionally outrageous or conscience shocking." (Dkt. 15-1 at 14 (citing *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011)).

"Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against

government action that is 'incorrect or ill-advised.'" *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (quotation modified). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). "The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Southerland*, 680 F.3d at 152 (quotation modified).

Here, the Court concurs with Defendants that Plaintiff has not pleaded facts indicating that Clark and Power engaged in conscience-shocking conduct. As the Second Circuit stated in *Cox*, "[a]bsent truly extraordinary circumstances, a brief deprivation of custody is insufficient to state a substantive due process custody claim" because it does not cause a total deprivation of a parent's protected liberty interest in raising their child. 654 F.3d at 275. Moreover, had due process been accorded—i.e., a family court determination withholding custody of L.K. from Plaintiff—then Clark and Power's conduct would have been in full accordance with the law. *See Southerland*, 680 F.3d at 152 ("In the child-removal context, we ask whether the removal would have been prohibited by the Constitution even had the plaintiffs been given all the procedural protections to which they were entitled." (quotation modified) (quoting *Tenenbaum*, 193 F.3d at 600)). Because Plaintiff has failed to plausibly establish that Clark or Power engaged in shocking or egregious conduct, he has not pleaded a viable cause of action for violation of substantive

due process. This claim is dismissed without leave to amend because any amendment would be futile. In other words, better pleading will not cure the deficiencies with this claim as discussed above.

**c. Equal Protection Clause**

Defendants contend that Plaintiff has failed to state an Equal Protection claim because the complaint provides no examples of similarly situated individuals who were treated differently. (Dkt. 15-3 at 15-16; Dkt. 25 at 7-9).

The Equal Protection Clause of the United States Constitution mandates equal protection under the law, and that similarly situated persons are treated equally. "To establish an Equal Protection claim, a plaintiff must show that he was treated differently than other persons who were similarly situated and that such differential treatment was either without a rational basis (a class of one claim) or was motivated by an intent to discriminate on an impermissible basis (a selective enforcement claim)." *Richard v. Dignean*, No. 6:11-CV-06013 EAW, 2023 WL 2480585, at *4 (W.D.N.Y. Mar. 13, 2023) (quotation modified).

To prevail on a selective enforcement equal protection claim, "a plaintiff must prove that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Burton v. Salerno*, No. 3:20-CV-1926 (VAB), 2023 WL 184238, at *15 (D. Conn. Jan. 13, 2023) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). In order to satisfy the first prong of a selective enforcement

claim, Plaintiffs must identify comparators who are "similarly situated in all material respects." *Hu*, 927 F.3d at 96 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Although the standard does not require Plaintiffs and the comparators to be identical, their "circumstances must bear a reasonably close resemblance." *Id.* (quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014)).

To state a plausible Equal Protection claim under a class of one theory, Plaintiff must allege (1) "that [he] has been intentionally treated differently from others similarly situated" and (2) "that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "[I]n order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high. More precisely, a plaintiff must establish that he and a comparator are '*prima facie* identical' by showing that '(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.' *Hu*, 927 F.3d at 92 (quoting *Nielson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

Because Plaintiff appears to be pursuing both a class of one and selective enforcement claim (*see* Dkt. 1 at ¶ 59), the Court will consider whether he has alleged sufficient comparators under both standards. Plaintiff clearly alleges that Clark and Power treated the mother more favorably because they have continuously let her take L.K. out of school without issue. In that sense, Plaintiff alleges that the mother is an adequate

comparator. But the allegations of the complaint reflect that the mother is not the same as Plaintiff in all material respects because Plaintiff himself alleges that she has sole physical custody of L.K. (Dkt. 1 at ¶ 17). As such, there is a clear distinction between Plaintiff and the mother that easily accounts for the school being more lenient with releasing L.K. to her—L.K. lives with the mother full-time. Because the crux of at least one of the theories underlying Plaintiff's Equal Protection claim is that he is being discriminated against despite having the same custodial status as the mother, the fact that he has pleaded a discernible difference in custody status between him and the mother is fatal to his attempt to establish an adequate comparator even under the lesser standard in a selective enforcement claim.

Plaintiff also points to the mother's domestic partner Joshua Stern ("Stern") as a similarly situated individual, alleging that the mother and Stern "were freely allowed to pick up the children. . . ." (Dkt. 1 at ¶ 34). However, Plaintiff does not plead any facts establishing that he and Stern are "*prima facie* identical" or "similar in all material respects" —in fact, the complaint is devoid of almost any information about Stern—which is insufficient to establish Stern as a proper comparator. Insofar as Plaintiff pleads that "other custodial parents" who have not been denied access to their children may serve as adequate comparators (Dkt. 1 at ¶ 59), that bald assertion is insufficient to plausibly establish the existence of similarly situated individuals who were treated differently by Clark and Power.

Although courts are "cautioned against deciding whether two comparators are similarly situated on a motion to dismiss," *Hu*, 927 F.3d at 97, a general allegation that

Plaintiffs were treated differently from those similarly situated is not enough to survive a motion to dismiss, *Rushton v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010). To allow an equal protection claim to proceed based on the vague, wholly conclusory allegation of similarly situated comparators like the one in Plaintiff's complaint would strip away the plausibility standard required by *Iqbal* and *Twombly*. Because Plaintiff has failed to provide more than a general allegation of comparators, his equal protection claim is dismissed. While the Court is skeptical that these deficiencies can be fixed with better pleading, it will nonetheless afford Plaintiff an opportunity to attempt to do so and thus grants leave to amend.

**v. Qualified Immunity**

With two § 1983 claims withstanding dismissal—the First Amendment retaliation claim and procedural due process claim—the Court must consider the argument by Defendants that Clark and Power are entitled to qualified immunity. (Dkt. 15-1 at 27-28). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (citation omitted). Although claims of qualified immunity "should be decided as early as possible in a case," it "is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." *Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013); *see also McKenna v. Wright,* 386 F.3d 432, 435-36 (2d Cir. 2004) (noting that generally "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief can be

granted") (alteration in original) (quoting *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir. 1983)). Therefore, "a defendant asserting a qualified immunity defense on a motion to dismiss 'faces a formidable hurdle . . . and is usually not successful.'" *Barnett v. Mt. Vernon Police Dep't,* 523 F. App'x 811, 813 (2d Cir. 2013) (quoting *Field Day, LLC v. Cnty. of Suffolk,* 463 F.3d 167, 191-92 (2d Cir. 2006)). "The defense will succeed only where entitlement to qualified immunity can be established 'based [solely] on facts appearing on the face of the complaint.'" *Id.* (quoting *McKenna,* 386 F.3d at 436).

Granting a qualified immunity defense is not appropriate at this juncture. It is clearly established law that Plaintiff is entitled to petition the government for redress of a violation of his constitutional rights and that he shall not be deprived of custody of his children without due process of law. Similarly, qualified immunity requires a finding of objective reasonableness, which cannot be discerned based on the limited factual record here that does not include, for example, the exact language Plaintiff used in his email to Power, the extent of communications between the mother and school officials, and what Clark and Power communicated to Plaintiff. Taking Plaintiff's allegations as true, the Court cannot conclude that the actions of Clark and Power did not violate clearly established law, or that it was objectively reasonable for them to believe their actions did not violate clearly established law. *See Cole-Hatchard v. Hoehmann*, No. 16 CV 5900 (VB), 2020 WL 5645815, at *12 (S.D.N.Y. Sept. 21, 2020) ("Moreover, the record evidence demonstrates material issues of fact, which preclude at this stage of the proceedings a determination that it was objectively reasonable for defendants to have participated in the allegedly retaliatory complained-of conduct."); *Jackson v. New York State,* 381 F. Supp. 2d 80, 91 (N.D.N.Y.

2005) ("Plaintiff alleges violations of her constitutional rights and, based on the complaint alone, it does not appear that defendants' actions were objectively reasonable. Further factual information is necessary, therefore, to determine whether defendants are entitled to qualified immunity."). Defendants' motion to dismiss Plaintiff's claims on grounds of qualified immunity is denied.

**D. Section 1986 Claim—Count Eight**

Plaintiff's eighth cause of action is a claim for neglect to prevent conspiracy with civil rights pursuant to 42 U.S.C. § 1986 against all Defendants. Plaintiff alleges that Defendants were aware of a conspiracy to deprive him of equal protection under the law but did not take action to prevent that from occurring. (Dkt. 1 at ¶¶ 72-74(a)). Defendants contend that because Plaintiff has failed to plead a viable claim under 42 U.S.C. § 1985 that his § 1986 can be premised upon, his § 1986 claim must be dismissed. (Dkt. 15-1 at 22-24).

"[Section] 1986 provides a cause of action against anyone who 'having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so.'" *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (citations omitted). "Thus, a § 1986 claim must be predicated upon a valid § 1985 claim." *Id.* (citing *Dacey v. Dorsey*, 568 F.2d 275, 277 (2d Cir. 1978)); *see also Mione v. McGrath*, 435 F. Supp. 2d 266, 272 (S.D.N.Y. 2006) ("[F]ailure to state a claim under Section 1985 is fatal to [a] Section 1986 claim."). Defendants are therefore correct that in order for Plaintiff's § 1986 claim to proceed, he must state a plausible claim under § 1985.

Although Plaintiff does not explicitly plead a cause of action under § 1985, the Court agrees with Defendants that based on the reading of the complaint, the only subsection by which Plaintiff has an arguable claim is § 1985(3). "In order to state a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (citing *Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006)). "A § 1985(3) 'conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Id.* (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)).

Here, Plaintiff has not stated a plausible claim under § 1985(3) because he has not pleaded facts from which the Court could reasonably conclude that Defendants' actions were motivated by class-based animus. Although Plaintiff alleges that he experienced "textbook sex discrimination" because of the District's alleged agreement to abide by the mother's request to exclude Plaintiff (Dkt. 23 at 37), Plaintiff "fails to allege any facts showing he was treated differently due to his membership in a protected class," *Klein v. Zugabie*, No. 15 CIV. 9093 (NSR), 2017 WL 374733, at *8 n.12 (S.D.N.Y. Jan. 24, 2017). In other words, the complaint is devoid of allegations supporting the notion that Plaintiff's gender played any role in the District's decision not to release L.K. to him—to the contrary, the complaint states that L.K. refused to leave with Plaintiff (Dkt. 1 at ¶ 34). And in any

event, Plaintiff's claim is belied by his own allegations that Stern—a male—was permitted to take L.K. out of school. Accordingly, Plaintiff "only offers conclusory allegations that the actions involved discriminatory animus" that are insufficient to plausibly establish a claim pursuant to § 1985(3). *Hollman v. Cnty. of Suffolk*, No. 06-CV-3589 (JFB)(ARL), 2011 WL 2446428, at *11 (E.D.N.Y. June 15, 2011); *see also Grant v. City of Syracuse*, No. 5:15-CV-445 (LEK/TWD), 2017 WL 5564605, at *9 (N.D.N.Y. Nov. 17, 2017) ("Alonzo's argument in support of his conspiracy claim consists of conclusory statements that the Arresting Officers' alleged misconduct can only be explained by implicit racial bias. While it is undisputed that Alonzo is African-American, conclusory statements linking officers' actions to race are insufficient to survive summary judgment." (citation omitted)).

Because the Court has found that Plaintiff's § 1985(3) claim is not sufficient to withstand the motion to dismiss, Defendants are correspondingly correct that there is no claim for an underlying conspiracy that Plaintiff's § 1986 claim may rely upon. Defendants' motion to dismiss Plaintiff's § 1986 claim is granted. Although the Court is skeptical as to Plaintiff's ability to assert such a claim under the circumstances here, it will nonetheless afford Plaintiff leave to amend given his *pro se* status.

### E. State Law Claims

#### i. Failure to Report Suspected Child Abuse—Count Four

Plaintiff alleges that Saitta's failure to report L.K.'s disclosure regarding lack of access to food at the mother's house and "coercion via therapy as emotional maltreatment/alienation" was a violation of New York Social Services Law § 413. (Dkt. 1

at ¶¶ 63-64). Defendants move to dismiss based on procedural deficiencies including that Plaintiff did not comply with New York's notice of claim requirements by failing to name Saitta as a potential defendant and filing a notice of claim outside the applicable time limits. (Dkt. 15-1 at 28-29). On the merits, Defendants contend that dismissal is warranted because Plaintiff has not alleged that Saitta's failure to report was knowing and willful. (*Id.* at 29-30).

Under New York Social Services Law, "teachers and school administrators [are] legally obligated to report suspected child abuse and neglect." *Oglesby v. Eikszta*, 499 F. App'x 57, 60 (2d Cir. 2012) (citing N.Y. Soc. Serv. Law § 413(a)). "A private right of action for money damages may lie against a teacher who fails to report in accordance with § 413." *S. Country Cent. Sch. Dist.*, 2016 WL 5349782, at *13 (quoting N.Y. Soc. Serv. Law § 420(2)).

"In federal court, state notice-of-claim statutes apply to state-law claims." *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 634-35 (quoting *Parise v. N.Y.C. Dep't of Sanitation,* 306 F. App'x 695, 697 (2d Cir. 2009)). "Under New York Education Law Section 3813(2) and New York General Municipal Law Section 50-e(1), a plaintiff is required to file a notice of claim with respect to [his] state law claims against defendants within ninety (90) days of the accrual of those claims as a condition precedent to bringing a personal injury action against defendants." *S. Country Cent. Sch. Dist.*, 2016 WL 5349782, at *13 (quoting *Tyrrell*, 792 F. Supp. 2d at 635 (quotation modified)); *see Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 368 (W.D.N.Y. 2010) ("Section 50-e further directs that such notice must be served 'within ninety days after the claim

arises.'"). "According to the New York Court of Appeals, the primary purpose of this pre-litigation notice statute is to put municipal officials 'in a position to investigate the facts as to time and place, and decide whether the case is one for settlement or litigation.'" *Id.* (quoting *Rosenbaum v. City of N.Y.*, 8 N.Y.3d 1, 11 (2006)). "Notice of claim requirements are strictly construed by New York state courts and a failure to comply with those requirements ordinarily requires dismissal of the state law claims." *Tyrrell*, 792 F. Supp. 2d at 636 (citing *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999)). "[A]n untimely Notice of Claim served without leave of the court is deemed a nullity." *Walker v. Vill. of Freeport*, No. 15CV4646JFBSIL, 2016 WL 4133137, at *12 (E.D.N.Y. June 13, 2016), *report and recommendation adopted*, No. 15CV4646JFBSIL, 2016 WL 4132252 (E.D.N.Y. Aug. 2, 2016).

Here, Plaintiff's allegations reflect that his notice claim did not comply with the mandates of New York Education Law Section 3813(2) and New York General Municipal Law Section 50-e(1). Plaintiff pleads that on July 17, 2023, Saitta emailed Plaintiff confirming that L.K. had confided in her about "suspected mistreatment" in the mother's home. (Dkt. 1 at ¶¶ 23-25). Plaintiff later pleads that he served "the first notice of claim" on January 30, 2025—over 18 months after Plaintiff alleges Saitta failed to report the suspected child abuse or neglect. Thus, by Plaintiff's own admission, he failed to timely comply with the strict notice of claim requirements mandated by New York. Plaintiff seeks to remedy that deficiency by proffering that "state notice-of-claim statutes cannot defeat or condition federal civil rights claims[,]" (Dkt. 23 at 19), and that is a true statement of law. Nevertheless, Plaintiff's point is unpersuasive as this specific cause of action alleges a

violation of state law and is not a federal civil rights claim. In light of Plaintiff's failure to adhere to New York's notice requirements, this claim must be dismissed without prejudice but without leave to amend.[6] *See S. Country Cent. Sch. Dist.*, 2016 WL 5349782, at *13 (dismissing claim under N.Y. Soc. Serv. Law § 413 because of a procedural deficiency in notice of claim).

**ii. Intentional Infliction of Emotional Distress—Count Five**

Plaintiff next asserts a claim for intentional infliction of emotional distress against the District, Clark, and Power for their "deliberate denial of access, despite joint custody, and failure to report maltreatment," which "constituted extreme and outrageous conduct. . . ." (Dkt. 1 at ¶ 66). As to the District, Defendants allege that this claim must be dismissed because "[i]t is well settled that pursuant to New York law, public policy bars claims for intentional infliction of emotional distress against a governmental entity." (Dkt. 15-1 at 30 (quoting *Wolfe v. Rochester*, No. 6:14-cv-6581-MAT-MWP, 2016 WL 5845569, at *5 (W.D.N.Y. Oct. 6, 2016)). Defendants are correct that Plaintiff cannot recover against a school district for intentional infliction of emotional distress, and this claim is dismissed against the District without leave to amend.

Defendants contend that the claim should be dismissed against Clark and Power also because Plaintiff has failed to allege that they engaged in extreme and outrageous conduct.

---

[6] A plaintiff who missed the deadline for filing a notice of claim may request an extension of time in state court. *See* N.Y. Gen. Mun. §§ 50-e(5); (7). This Court is without jurisdiction to grant Plaintiff leave to file a late notice of claim. *Horvath v. Daniel*, 423 F. Supp. 2d 421, 424 (S.D.N.Y. 2006).

(Dkt. 15-1 at 30-31). "The New York state law tort of intentional infliction of emotional distress 'has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.' . . . Furthermore, 'New York sets a high threshold for conduct that is "extreme and outrageous" enough to constitute intentional infliction of emotional distress.'" *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 690 (E.D.N.Y. 2012) (quoting *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996)). The conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122 (1993)).

Here, not only has Plaintiff failed to allege conduct by Clark and Power that was so extreme and outrageous to go beyond all bounds of decency, but also absent from the complaint are allegations that Clark and Power acted with the intention to inflict emotional distress on Plaintiff. The allegations reflect that the mother informed school officials that L.K. did not want to see Plaintiff and that when Plaintiff showed up at the school, L.K. refused to leave with him. (Dkt. 1 at ¶¶ 30, 34). Thus, even by Plaintiff's own admissions, Clark and Power acted in accordance with L.K.'s alleged wishes rather than an expression of malice towards Plaintiff. Taking the allegations against Defendants as true, there is simply no reasonable basis for the Court to conclude that any Defendants intentionally inflicted emotional distress upon Plaintiff. For these reasons, the claim must be dismissed. Moreover, the Court declines to grant Plaintiff leave to replead because better pleading

cannot cure the deficiencies with this claim—particularly in view of the facts as alleged in the complaint. In other words, a liberal reading of the facts as alleged does not give any indication that a claim for intentional infliction of emotional distress could be validly asserted against Defendants.

**iii. Negligence—Count Nine**

Plaintiff alleges a claim for negligence, contending that the District, Clark, and Power owed him and L.K. a duty of care under New York law and various District policies to "reasonably interpret custody documents, facilitate equal justice for joint custodians, report suspected abuse, and avoiding facilitating alienation," which arises from their role as state actors *in loco parentis*. (Dkt. 1 at ¶ 76). Plaintiff further alleges that Defendants breached that duty by not reporting the suspected child abuse and denying Plaintiff access to L.K. (*Id.* at ¶ 77). Defendants move to dismiss this count on the grounds that Plaintiff has failed to establish that Defendants owed him a duty of care. (Dkt. 15-1 at 31-32).

"The elements of a negligence claim under New York law are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Pasternack v. Lab. Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015) (quotation omitted). "It is axiomatic that there can be no claim for negligence in the absence of a duty of care, running to the injured party," and "[t]he existence and scope of a duty is an issue of law for the court to determine." *Kennedy-McInnis v. Biomedical Tissue Servs., Ltd.*, 178 F. Supp. 3d 97, 102 (W.D.N.Y. 2016).

First, the Court agrees that New York law does not establish that Defendants owed Plaintiff a duty of care stemming from their role as state actors *in loco parentis*. "In New

York, schools owe a special duty . . . to students[,] requir[ing] a school to act when a child, while in its charge, is threatened by the negligence of a third party, and it must make reasonable efforts to anticipate such threats" and "will be held liable for foreseeable injuries proximately related to the absence of adequate supervision." *Murray v. Nazareth Reg'l High Sch.*, No. 20-CV-1471 (RJD) (RML), 2022 WL 3139116, at *2 (E.D.N.Y. Aug. 5, 2022) (quotations and citations omitted); *PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 568 (E.D.N.Y. 2021) ("Starting with the duty element, it is well settled that [i]n New York, schools are under a special duty of *in loco parentis*, which obligates them to exercise such care of [their charges] as a parent of ordinary prudence would observe in comparable circumstances." (quotation modified). But while Plaintiff correctly identifies that Defendants were under a special duty, he fails to account for the fact that the duty of *in loco parentis* extends to a school's duty to students, not parents. And because the Court has found that Plaintiff may not bring suit on behalf on his children in this action as a *pro se* party, whether Defendants owed a duty to L.K. is not relevant to the determination whether Plaintiff has plausibly pleaded that Defendants owed him a duty of care.

Second, the Court is unpersuaded that Plaintiff may rely on several District policies to establish that Defendants owed him a duty of care. Defendants cite *Schiebel v. Schoharie Cent. Sch. Dist.*, No. 1:22-CV-1109 (LEK/DJS), 2025 WL 1727117, at *3 (N.D.N.Y. June 20, 2025), in which the court held that no legal duty of care existed "to enforce the school district's policies and procedures equitably and fairly. . . ." (citing *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 181 (N.D.N.Y. 2020) (university had no duty of care to keep the

plaintiff free from discrimination)) (further citation omitted). The undersigned concluded similarly in *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 409 (W.D.N.Y. 2017), finding that New York law did not recognize a duty of care arising out of a school's accreditation standards. Plaintiff not having identified any caselaw to the contrary, the Court concludes that Plaintiff has not plausibly established that District policies conferred a duty of care on Defendants to Plaintiff. This claim is dismissed without leave to amend because better pleading will not cure these deficiencies.

**CONCLUSION**

For the foregoing reasons, the Court grants Plaintiff's motion for leave to file notice of supplemental authority (Dkt. 20) and Plaintiff's motion for leave to file a sur-reply (Dkt. 27). As noted above, the Clerk of Court is directed to file Plaintiff's sur-reply, attached as Exhibit A to Docket 27 at pages 4 through 26, on the docket.

The Court also grants the motion to dismiss (Dkt. 15) on all causes of action except for Plaintiff's claim for First Amendment retaliation (Counts Six and Ten) and a violation of procedural due process (Counts One and Seven). Because the surviving claims are asserted against Clark and Power only, the District and Saitta are dismissed from this action. In addition, as noted, Plaintiff may not pursue claims on behalf of his minor children and they shall be terminated as plaintiffs in this action.

Plaintiff may file an amended complaint in accordance with this Decision and Order within thirty (30) days. Plaintiff is cautioned that any amendment must comply with this Decision and Order, and he may only attempt to plead dismissed claims where leave to amend was granted. Moreover, if Plaintiff attempts to plead dismissed claims he must

plausibly allege facts in accordance with the principles set forth herein, along with the personal involvement of any identified defendant. Plaintiff is further advised that an amended complaint is intended to completely replace the prior complaint in the action. "It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)). Therefore, Plaintiff's amended complaint must include all of the allegations against Defendants so that the amended complaint may stand alone as the sole complaint in this action which Defendants must answer. If Plaintiff does not file an amended complaint, this action will proceed on the claims for First Amendment retaliation (Counts Six and Ten) and violation of procedural due process (Counts One and Seven) against Clark and Power only. All other claims against all other defendants will remain dismissed.

Defendants' deadline to answer or otherwise appear in this matter is held in abeyance pending further order of the Court, and will be set once it is clear whether Plaintiff intends to file an amended complaint in accordance with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Judge

Dated: September 14, 2026
Rochester, New York